UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR COMPANY,

    Plaintiff,

v.                                                       Case No. 08-12960
                                                     Honorable Patrick J. Duggan

UNITED STATES OF AMERICA,

    Defendant.
_____/

### OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on June 3, 2010.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                      U.S. DISTRICT COURT JUDGE

Ford Motor Company ("Ford") filed this lawsuit against the United States ("Government") under the internal revenue laws, seeking to recover additional interest Ford claims it is due for calendar years 1983-1989, 1992, and 1994. Presently before the Court are the Government's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and Ford's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). The motions have been fully briefed and the Court held a motion hearing on April 15, 2010.

## I. Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (6th Cir. 2008). Reviewing a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and "determine whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Bledsoe v. Community Health Sys.*, 501 F.3d 493, 502 (6th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct 1955, 1974 (2007)).

Summary judgment pursuant to Rule 56(c) is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

## II. Background

### A. Ford's Theories of Liability

Ford is seeking relief pursuant to three different theories of liability. The first theory (and Ford's "primary" theory) is set forth in what Ford refers to as its "deposit remittance" counts (Counts I-IX of the Complaint). The second theory is contained in what Ford calls its "carryback recapture" counts (Counts X-XIII); and the third theory is set forth in what Ford refers to as its "carryback allowance" count (Count XIV). The following describes the tax concepts and procedures relevant to these three theories of liability.

### B. Taxes and Interest

Tax returns filed by corporate taxpayers are subject to Internal Revenue Service ("IRS" or "Service") review and audit. These audits can lead the IRS to find additional tax owed by the taxpayer or that the taxpayer has overpaid its taxes for a specific year.

Pursuant to the internal revenue laws, if a taxpayer overpays its tax for a specific year, the Government may owe interest to the taxpayer on the overpayment (in addition to a refund or credit for the amount overpaid). 26 U.S.C. § 6611. This is referred to as "overpayment interest." According to the statute, "[s]uch interest shall be allowed and paid" from the "date of the overpayment" to the date of the refund or credit. *Id.* at § 6611(b).

Conversely, where a taxpayer has underpaid its taxes, the taxpayer may owe interest to the Government on the amount of the underpayment– i.e. "underpayment

interest." 26 U.S.C. § 6601.  Underpayment interest accrues from "the last date prescribed for payment . . . to the date paid." *Id*. at § 6601(a).  Because an audit and related administrative appeals of a return can take years to complete, it is possible for considerable underpayment interest to accrue in the interim.

To address this situation, the IRS has promulgated a mechanism by which taxpayers can remit money to the Service and stop the accrual of underpayment interest. Such a remittance– referred to as a "deposit in the nature of a cash bond"– is set forth in IRS Revenue Procedure 84-58, 1984-33 I.R.B. 9.  Section 5 of Revenue Procedure 84-58 provides that "[t]he running of interest on an assessed tax liability . . . will stop on the date the remittance [i.e. the deposit in the nature of a cash bond] is received by the Service."  While a deposit in the nature of a cash bond stops the accrual of underpayment interest from the date the deposit is remitted, the Revenue Procedure states that interest does *not* accrue from that date forward if the deposit subsequently is returned to the taxpayer as a result of an overpayment.  In fact, several sections of Revenue Procedure 84-58 specifically provide that a deposit returned to the taxpayer "does not bear interest." *See* Rev. Proc. 84-58 §§ 2.03, 4.02, 5.01.

A taxpayer alternatively can make an advance payment of tax, which the IRS treats as accruing interest from the date it is received by the Service if the payment or a portion thereof is subsequently refunded to the taxpayer. *See id*. § 5.05.  However, to obtain a refund or a credit of an advance tax payment, the taxpayer must follow certain refund procedures.  Additionally, the taxpayer's request for a refund is subject to the limitations

4

period set forth in 26 U.S.C. § 6511. In comparison, a deposit in the nature of a cash bond will be returned with limited exceptions upon a taxpayer's simple letter request "at any time before the Service is entitled to assess the tax" without the taxpayer having to resort to refund procedures. Rev. Proc. 84-58 § 5.01-5.02; *see also United States v. Domino Sugar Corp.*, 349 F.3d 84, 87 n.2 (2d Cir. 2003). As well, the statute of limitations applicable for filing a refund claim does not apply to a claim for the return of a cash bond. *See Domino Sugar Corp.*, 349 F.3d at 87 (citing cases).

### C. Facts Relevant to Ford's "Remittance Deposit" Counts

The facts related to Ford's claims are not in dispute. Ford submitted remittances to the IRS on September 9 and 27, 1991, July 6, 1992, and June 23, 1994, specifically requesting in writing that the remittances be treated as deposits in the nature of a cash bond. These remittances were made after the IRS sent a 30-day letter for tax years 1983-1986 and 1988. A portion of the deposits also applied to tax years 1987, 1989, 1992, and 1994, before 30 day letters were sent for those tax years. A 30-day letter accompanies a Revenue Agent Report proposing additional tax liabilities, and allows the taxpayer 30 days to file a protest with the IRS Appeals Office challenging the proposed liabilities.

Ford subsequently requested that the IRS treat its remittances as advance payments rather than deposits in the nature of a cash bond. Those requests were made on the following dates for the following remittances: (1) December 19, 1994 for the September 9, 1991 deposit; and (2) December 15, 1995 for the September 27, 1991, July 6, 1992, and June 23, 1994 deposits. Sometime after these dates, the IRS determined that Ford

5

had overpaid its tax liabilities for the years at issue. The IRS therefore refunded to Ford the overpayment plus overpayment interest; however, the IRS did not pay interest for the time the remittances were designated by Ford as deposits in the nature of a cash bond. The IRS only paid overpayment interest from the dates when Ford requested that the deposits be converted to advance payments. In its "deposit remittance" theory of liability, Ford argues that overpayment interest should have accrued from the dates that it made the deposits in the nature of a cash bond.

### D. "Carryback Recapture"

A taxpayer experiencing a net operating loss ("NOL") in a given year can "carryback" the NOL to offset the taxpayer's taxable income in an earlier year and achieve a refund for that earlier year. The IRS pays the refund tentatively ("tentative Carryback allowance") but may, after an audit of the year in which the NOL arose, determine that the NOL carryback should be reduced. This reduction is referred to as a "carryback recapture." Because the taxpayer already received a refund for the earlier year based on the carryback, the carryback recapture will result in a tax liability for that earlier year. Underpayment interest related to the amount of the carryback recapture will be owed from the filing date for the year in which the NOL arose until the date on which the taxpayer repays the excessive amount. IRS Notice 88-119, 1988-2 CB 453.

In tax years 1985, 1987, 1988, and 1989, Ford had carryback recaptures. Therefore, Ford was obligated to pay underpayment interest on the amount of the recaptures from the filing date for the year in which the NOL carryback arose until the

6

excessive amount was repaid. Before these liabilities were assessed, however, Ford had made deposits in the nature of a cash bond to stop the accrual of underpayment interest on any tax liabilities. Ford alleges in Counts X-XIII of its Complaint– setting forth its "carryback recapture" theory of liability– that the Government should have applied the necessary portion of its deposits to pay those excessive amounts.

The Government did not do so. Instead, to collect the carryback recapture amount, the Government applied a portion of an overpayment that Ford made for the 1985 tax year which was accruing overpayment interest. As a result, the Government avoided paying continued overpayment interest on that portion of the 1985 refund.

### E. "Carryback Allowance"

Ford's "carryback allowance" theory of liability– set forth in Count XIV of its Complaint– relates to a $20.04 million underpayment for the 1984 tax year and the money the Government used to satisfy that underpayment. Specifically, the Government applied a $19.48 million carryback allowance that hit Ford's account on March 15, 1992, rather than deposit remittances Ford had made effective September 9, 1991. Ford contends that by using the carryback allowance instead of the deposit remittances, the Government improperly avoided paying overpayment interest on the amount of the carryback allowance.[1] In other words, if the Government had applied a portion of the deposit remittances to the 1984 underpayment, Ford would have been entitled to

---

[1] Ford acknowledges that the Government did stop the accrual of interest on the $20.04 million underpayment as of the date of the deposit remittances.

overpayment interest on the full amount of the March 15, 1992 carryback allowance.

## III. Analysis

### A. Deposit Remittance Counts

Ford asserts several arguments to support its claim that deposits in the nature of a cash bond accrue interest from the date remitted to the IRS. First, Ford argues that statutory rules of construction require that the payment date in 26 U.S.C. §§ 6601 and 6611 be read symmetrically. Section 6601 provides that interest on an *underpayment* accrues from the last date prescribed for payment "to the date paid." 26 U.S.C. § 6601. Section 6611 provides that interest on an *overpayment* accrues "from the date of the overpayment" to the date a credit or refund is given. Because a deposit in the nature of a cash bond stops the running of underpayment interest for purposes of § 6601 from the date of the deposit's remittance, Ford argues that interest should begin to run for purposes of overpayment interest under § 6611 also on the remittance date. Stated differently, Ford argues that "when interpreting these two statutes, one must ensure that the 'payment' status of a remittance is treated consistently for purposes of **stopping** the accrual of underpayment interest under § 6601 and for **starting** the accumulation of overpayment interest under § 6611." (Doc. 43 at 14 (emphasis in original).)

Ford next argues that Revenue Procedure 84-58 confirms its interpretation of § 6611. Specifically, Ford points to the first sentence of Section 5.01 which states that the running of interest on an assessed tax liability stops on the date a deposit in the nature of a cash bond is remitted. Ford also points to Section 5.05 which states:

8

> Remittances treated as payments of tax will be treated as any other assessed amount and compound interest will be paid on any overpayment under section 6611 of the Code. In the event that [a] deposit in the nature of a cash bond is posted to a taxpayer's account as a payment of tax, pursuant to subparagraph 3 of section 4.02,[2] interest will run on an overpayment later determined to be due only from the date the amount was posted as a payment of tax.

Rev. Proc. 84-58 § 5.05.

Ford interprets the above-quoted section as stating, as a general rule, that overpayment interest will be paid on any remittance treated as a tax payment regardless of whether the remittance was initially made as a tax payment or made as a deposit and subsequently converted to a payment of tax. Ford interprets the second sentence as stating one exception to this general rule. In other words, Ford reads Section 5.05 as meaning that overpayment interest accrues from when a remittance is made, regardless of whether it is classified as a payment of tax or a deposit in the nature of a cash bond,

---

[2]Subparagraph 3 of Section 4.02 of Revenue Procedure 84-58 provides, in part:

> Upon completion of an examination, if the taxpayer who has made a deposit does not execute a waiver of restrictions on assessment and collection [of the deficiency] or otherwise agree to the full amount of the deficiency, the Service will mail a notice of deficiency and the taxpayer will have the right to petition the Tax Court. That part of the deposit that is not greater than the deficiency proposed plus any interest that has accrued on the deficiency will be posted to the taxpayer's account as a payment of tax . . . Any amount of the remittance that exceeds the proposed liability will be continued to be considered a deposit and will be returned to the taxpayer without interest subject to the provisions in subparagraph 1 of this section.

9

unless it is a deposit pursuant to subparagraph 3 of Section 4.02.

Ford argues that its interpretation "makes perfect sense" because it penalizes the taxpayer (i.e. by not paying overpayment interest) "[w]here [the] taxpayer makes a deposit and then refuses to execute a waiver of assessment (thereby creating a deficiency and permitting the taxpayer to challenge the assessment in the U.S. Tax Court), . . .." (Doc. 43 at 19.) Ford further points out that the exception in the second sentence would be mere surplusage if, as a general rule, overpayment interest only began to accrue from the date a deposit in the nature of a cash bond is converted to a tax payment (rather than on the date the deposit is remitted).

As noted earlier, several provisions of Revenue Procedure 84-58 specifically state that deposits in the nature of a cash bond do not bear interest if returned to a taxpayer. Ford maintains, however, that these provisions are referring to deposits that are never converted to tax payments. Deposits returned to the taxpayer before being converted to tax payments are returned without the taxpayer resorting to refund procedures and are not subject to the limitations period for seeking refunds or credits. Thus Ford maintains that the distinction of whether a deposit in the nature of a cash bond accrues interest from the date remitted should depend on whether the deposit subsequently is returned to the taxpayer or converted to a tax payment.

Even if the Court found merit in Ford's arguments– particularly its interpretation of subsection 5.05 of Revenue Procedure 84-58 which the Court does not believe the

Government addresses sufficiently[3]– the Court must be mindful of the deference it is required to give the IRS' interpretation of the Internal Revenue laws. As the United States Supreme Court has stated:

> "[W]e do not sit as a committee of revision to perfect the administration of the tax laws." *United States v. Correll*, 389 U.S. 299, 306-07, 88 S. Ct. 445, 19 L.Ed.2d 537 (1967). Instead, we defer to the Commissioner's regulations as long as they "implement the congressional mandate in some reasonable manner." *Id.*, at 308, 88 S. Ct. 445. "We do this because Congress has delegated to the [Commissioner], not to the courts, the task of prescribing all needful rules and regulations for the enforcement of the Internal Revenue Code." *National Muffler Dealers Assn., Inc. v. United States*, 440 U.S. 472, 477, 99 S. Ct. 1304, 59 L.Ed.2d 519 (1979) (citing *Correll*, 389 U.S. at 307, 88 S. Ct. 445) (citing 26 U.S.C. § 7805(a))). This delegation "helps guarantee that the rules will be written by 'masters of the subject' who will be responsible for putting the rules into effect." 440 U.S., at 477, 99 S. Ct. 1304 (quoting *United States v. Moore*, 95 U.S. 760, 763, 24 L.Ed. 588 (1877)).

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 218-19, 121 S. Ct. 1433,

---

[3]In response to Ford's argument based on Section 5.05 of Revenue Procedure 84-58, the Government explains that there are three types of remittances provided for in the revenue procedure: (1) deposits in the nature of a cash bond that are later returned to the taxpayer without the taxpayer resorting to refund procedures; (2) advance tax payments applied to the taxpayer's proposed liabilities at the time of remittance that cannot be refunded without resort to refund procedures; and (3) and deposits in the nature of a cash bond that are converted to payments. The Government contends that, as a general rule, remittances in the third category resulting in an overpayment will earn interest "only from the date the amount was posted as a payment of tax." The second sentence of subsection 5.05, however, refers to a remittance that falls within the third category (i.e. a "*deposit in the nature of a cash bond [that] is posted to a taxpayer's account as a payment of tax* pursuant to subparagraph 3 of section 4.02 . . ." where "an overpayment is later determined to be due"). Revenue Proc. 84-58 (emphasis added).

1444 (2001); *see also Cottage Sav. Ass'n v. Comm'rs of Internal Revenue*, 499 U.S. 554, 111 S. Ct. 1503 (1991). Therefore, provided it is reasonable, this Court must accept the Government's interpretation of § 6611.

When assessing the reasonableness of the Government's interpretation, the Court must further bear in mind that "[e]xaction of interest from the Government requires statutory authority." *Rosenman v. United States*, 323 U.S. 658, 663, 65 S. Ct. 536, 538 (1945). Such authority must be strictly construed in favor of the sovereign and "not enlarge[d] beyond what the [statutory] language requires." *See Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S. Ct. 2957, 2963 (1986) (superseded by statute on other grounds).

As set forth previously, § 6611 requires the Government to pay overpayment interest "from the date of overpayment . . ." Similarly, § 6601 requires a taxpayer to pay underpayment interest from the date prescribed for payment "to the date [the underpayment is] paid." The Internal Revenue Code does not define when an underpayment or overpayment is "paid." The effect of the IRS' promulgation of a procedure by which taxpayers can remit a deposit to stop the accrual of underpayment interest is that the date of payment for purposes of § 6601 is the date a deposit in the nature of a cash bond is remitted. Nevertheless, this does not mean that § 6611 must be similarly interpreted to define "the date of overpayment" as the date the deposit was made. Although courts generally must presume that "'identical words used in different parts of the same act are intended to have the same meaning,' . . the presumption 'is not

rigid,' and 'the meaning of the same words well may vary to meet the purposes of the law." *Cleveland Indians Baseball*, 532 U.S. at 213, 121 S. Ct. at 1441 (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S. Ct. 607 (1932)).

Additionally, as the Government points out, other sections of the Internal Revenue Code (specifically §§ 6213 and 6511) depend upon the date of payment and are not interpreted symmetrically with § 6601. In discussing the Tax Court's jurisdiction under § 6213, Revenue Procedure 84-58 instructs that, when designated as such, "[a] deposit in the nature of a cash bond is not a payment of tax" which as the Supreme Court has noted would wipe out a deficiency and therefore the Tax Court's jurisdiction which depends on the existence of a deficiency. *Baral v. United States*, 528 U.S. 431, 439 n.2, 120 S. Ct. 1006, 1011 n.2 (2000). With respect to § 6511, the Supreme Court explicitly has held that deposits in the nature of a cash bond are *not* payments of tax for purposes of when the statute of limitations for filing a claim for credit or refund begins to run. *Rosenman v. United States*, 323 U.S. 658, 65 S. Ct. 536 (1945).

The issue presented in *Rosenman* was whether the three-year limitations period for filing a claim for refund began to run when a deposit in the nature of a cash bond was remitted or when the deposit or a portion thereof was applied to satisfy an assessed tax. The statute of limitations in *Rosenman*, like current § 6511, provided that a claim for a tax refund must be made "within three years next after *the payment of such tax*." 323 U.S. at 659, 65 S. Ct. at 537 (emphasis added). The Government argued that because the taxpayer's deposit stopped the running of penalties and interest it therefore should to be

13

treated as a payment of tax, rendering the refund claim untimely. *Id*. at 662, 65 S. Ct. at 538. The Supreme Court rejected this argument and held that the statute of limitations did not begin to run until the deposit was applied to a defined tax obligation. In reaching this holding, the Supreme Court specifically noted that the Government had taken the position that such a deposit was "not a 'payment' interest on which is due from the Government if there is an excess beyond the amount of the tax eventually assessed." *Id*.

Consistent with this holding, the Sixth Circuit has concluded that a remittance *made to satisfy a proposed deficiency* and discharge any further tax liability is a "payment" of tax. *Ameel v. United States*, 426 F.2d 1270 (6th Cir. 1970). As the *Ameel* court explained in reaching this holding:

> In general, a tax is considered "paid" for purposes of the running of the period of limitations when a taxpayer files his return, accompanied by his payment. . . . On the other hand, where there is no tax liability computed and proposed, a remittance is to be treated as a cash bond to stop the running of interest on the amount 'dumped,' . . . or deposited until a more definite determination of tax liability is asserted by the Government. . . . In such cases, "payment" occurs when the indefinite tax liability is further defined; such as by a formal assessment of a definite amount.

426 F.2d at 1272 (internal citations omitted). The court also identified specific "factors" that determine what constitutes a "payment":

> "This much is clear: (1) a remittance is not per se 'payment' of the tax; (2) a remittance that does not satisfy an asserted tax liability should not be treated as the 'payment' of a tax; and (3) an essential factor in "payment" before assessment is the satisfaction or discharge of what the taxpayer deems a liability."

*Id*. (quoting Mertens, Law of Federal Income Taxation, Vol. 10, § 58.27 at 79 (1964 ed.)). Applying those "factors," the Sixth Circuit concluded that the remittance involved in the case before it was "the advance payment of a computed and proposed tax liability, not the remittance of an estimated or approximated tax liability." *Id*. at 1274.

In this Court's view, the Supreme Court's and Sixth Circuit's decisions alone compel the conclusion that Ford's remittances at issue in this case were not "tax payments" and that, therefore, the Government's interpretation of § 6611 is reasonable. Further supporting this conclusion is the fact that the statute only provides for interest from the Government from the "date of the overpayment." § 6611(b). It is reasonable to conclude, as the IRS has, that there can be no overpayment of tax until the entire tax liability has been paid. *See* 26 C.F.R. § 301.6611-1(b) (providing that, subject to one exception, "there can be no overpayment of tax until the entire tax liability has been satisfied. Therefore, the dates of overpayment of any tax are the date of payment of the first amount which (when added to previous payments) is in excess of the tax liability.") While Ford's arguments in favor of its interpretation of the statute may have some merit, the Government's interpretation, as set forth before, must be upheld as long as it is reasonable. *Cleveland Indians Baseball, supra*.

For the above reasons, the Court concludes that Ford is not entitled to additional overpayment interest from the dates that it remitted deposits in the nature of a cash bond to the dates those remittances were converted to tax payments. For the reasons that follow, the Court also rejects Ford's other theories of liability.

15

As a reminder, in its "carryback recapture" counts, Ford complains that the Government wrongfully used an overpayment from the 1985 tax year to collect carryback recaptures for the 1985, 1987, 1988, and 1989 tax years instead of Ford's deposits in the nature of a cash bond that had been remitted before the liabilities were assessed. In its "carryback allowance" count, Ford complains that the Government wrongfully used a carryback allowance to satisfy an underpayment for the 1984 tax year rather than its deposit remittances. Ford, however, cites no legal basis for its claim that the Government was required to apply its deposits to collect these amounts.

As Ford explains in its pleadings, and this Court explained above, the IRS promulgated the procedure for making a deposit in the nature of a cash bond to address the situation in which underpayment interest may accrue before a final tax assessment can be made. Pursuant to this procedure, taxpayers are able to stop the running of interest on potential deficiencies by remitting a deposit. However this Court finds nothing in those procedures– Ford cites no other authority– that would require the Government to apply those remittances to pay an assessed deficiency rather than other monies in the taxpayer's account. Absent any authority requiring the IRS to apply the deposit to satisfy a subsequently assessed liability, the Court finds no reason why the Service cannot choose which monies to use.

## IV. Conclusion

For the reasons set forth above, the Court concludes that Ford's challenges to the Government's treatment of its deposits fail as a matter of law.

Accordingly,

**IT IS ORDERED**, that the Government's motion for judgment on the pleadings is **GRANTED**;

**IT IS FURTHER ORDERED**, that Ford's motion for summary judgment is **DENIED**.

                                              s/PATRICK J. DUGGAN
                                              UNITED STATES DISTRICT JUDGE

Copies to:
Richard E. Zuckerman, Esq.
Jennifer Zbytowski Belveal, Esq.
Douglas C. Salzenstein, Esq.
Christine S. Hooks, Esq.